UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK L. GUEVARRA, SR., | Case No. CV 14-4499-KK |
| Plaintiff, | |
| v. | MEMORANDUM AND ORDER |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Mark L. Guevarra, Sr., seeks review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Agency") denying his application for Title II disability insurance benefits ("DIB"). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the Commissioner's decision is REVERSED and this action is REMANDED for further proceedings consistent with this Order.

**I.**

**PROCEDURAL BACKGROUND**

On September 15, 2010, Plaintiff filed an application for DIB. Administrative Record ("AR") at 120. The application was denied initially on December 27, 2010, and

1

upon reconsideration on June 10, 2011. Id. at 72, 76.

On July 12, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Id. at 90. On September 17, 2012, a hearing was held, before ALJ Mary L. Everstine, at which Plaintiff was represented by counsel. Id. at 46. On October 26, 2012, the ALJ issued a decision denying Plaintiff's application. Id. at 21.

On February 6, 2014, Plaintiff asked the Agency's Appeals Council to review the ALJ's decision, and submitted additional exhibits for the Appeals Council's consideration.[1] Id. at 4. On April 23, 2014, the Appeals Council denied the request for review. Id. at 1.

On June 11, 2014, Plaintiff filed the instant action. ECF No. 1. This matter is before the Court on the parties' Joint Stipulation, which the Court has taken under submission without oral argument. ECF No. 26.

## II.
## RELEVANT FACTUAL BACKGROUND

**A.  General Information**

Plaintiff was born on February 21, 1963, and his alleged disability onset date is October 30, 2009. AR at 120. Plaintiff was 46 years old at the time of the alleged onset date, and 49 years old at the time of the hearing before the ALJ.

Plaintiff claimed in a disability report that he completed eleventh grade, but he testified at the hearing before the ALJ that he only completed tenth grade. Compare id. at 49 with id. at 134. From 2000 to 2004, Plaintiff worked as a bouncer at a restaurant. Id. at 134. From 2005 to 2007, Plaintiff worked as "apartment security" at an apartment complex. Id. From 2007 to 2009, Plaintiff worked as a coffee shop manager at a market. Id.

In his initial application for benefits, Plaintiff alleged disability based upon "left

---

[1] Plaintiff protectively filed his appeal before February 6, 2014. See AR at 20.

2

knee injury; lower back injury; [and] arthritis in hands, knees." Id. at 133 (numbering and paragraph breaks omitted).

**B. Medical Evidence**

    **1. Dr. Daniel F. Craviotto**

On January 9, 2009, Plaintiff was examined by Dr. Daniel F. Craviotto. Id. at 180. Dr. Craviotto had treated Plaintiff 14 years earlier, repairing Plaintiff's medial collateral ligament after he dislocated his left knee. Id. Since that time, Dr. Craviotto stated, Plaintiff had "done well." Id.

During the examination, Plaintiff complained that, two days earlier, he had been walking and "felt a pop about his left knee." Id. After examining Plaintiff, Dr. Craviotto diagnosed him with "status post ACL/MCL repair 14 years ago, left knee," and with "mild to moderate osteoarthritis, left knee." Id. Dr. Craviotto gave Plaintiff a cortisone injection and sent him to physical therapy, with instructions to "follow-up with me as needed." Id.

    **2. Dr. Allen J. Thomashefsky**

Plaintiff was treated by Dr. Allen J. Thomashefsky periodically between November 11, 2009, and March 31, 2010. Id. at 182-200.

Dr. Thomashefsky performed a complete physical examination on Plaintiff on November 11, 2009. Id. at 192, 194. Dr. Thomashefsky's examination report from that date states Plaintiff had been in a car accident on October 30, 2009, in which he was rear-ended by another car. Id. at 192. Plaintiff was "shaky" after the accident and called 911, then drove home to Santa Barbara. Id. at 192-93. Plaintiff tried to sleep later that day, but was unable to do so "because of pain, mostly in his right elbow." Id. at 193. In the 11 days after the accident, Plaintiff complained about headaches; his left jaw popping; neck pain; extreme soreness in his right arm; pain in his "left third finger"; and soreness in his left shoulder, upper back, lower back, and over his sacrum. Id. Plaintiff stated his

sleep was "very disturbed because of pain." Id.  Plaintiff reported he was "frustrated because he has no income, he is injured, he has terrible pain and he is not sleeping, which makes him fatigued." Id. at 194.  Dr. Thomashefsky's report stated:  "He is very sad and is having spells of crying because of the above." Id.  Plaintiff told Dr. Thomashefsky that, before the car accident, "he rode his bike for exercise and to strengthen his knees," and "he worked as a gardener, which was very physical work." Id.  The report stated Plaintiff "has not worked since the accident." Id.

On November 11, 2009, Dr. Thomashefsky put Plaintiff on "temporary total disability." Id. at 199.  Dr. Thomashefsky also prescribed Plaintiff Darvocet-N, which "is used to relieve mild to moderate pain," and Soma, which is used "to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." Id.; see also FDA, Medication Guide:  Darvocet-N 100, http://www.fda.gov/downloads/Drugs/DrugSafety/UCM187067.pdf; NIH, Carisoprodol: MedlinePlus Drug Information, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682578.html.

Dr. Thomashefsky periodically monitored and treated Plaintiff after the complete physical examination on November 11, 2009.  See AR at 182-89.

On March 12, 2010, Dr. Thomashefsky saw Plaintiff. Id. at 183.  Dr. Thomashefky's report from that date stated Plaintiff was "now 5 months post-injury," was "doing well," and had been released from physical therapy earlier that week. Id.  Dr. Thomashefsky stated Plaintiff was "still off work." Id.  Dr. Thomashefsky stated he expected to see Plaintiff on April 1, 2010, and he would "probably release [Plaintiff] for work at that time." Id.

On March 31, 2010, Dr. Thomashefsky saw Plaintiff. Id. at 182.  According to Dr. Thomashefsky's report from that date, Plaintiff stated he had "no more neck problems," but was still sore and weak in his right elbow and right wrist. Id.  Plaintiff complained of occasional, low-grade soreness in his lower back when he was active. Id.  Dr. Thomashefsky released Plaintiff "to go back to work," but stated Plaintiff could see him

as needed "since he is not all better."  Id.

### 3. American Indian Health and Services

From July 2010 to June 2013, Plaintiff received treatment at American Indian Health and Services ("AIHS"), largely from Dr. Bradley E. Hope.  Id. at 177-78, 209-37, 268-71, 295-348, 370-408.  On July 20, 2010, Dr. Hope found Plaintiff suffered from the following "active problems":  high cholesterol, hyperglycemia, and obesity.[2]  Id. at 346.  The ALJ accurately summarized early portions of Dr. Hope's treatment records as follows:[3]

> [O]n July 6, 2010, Dr. Hope reported the claimant has a history of methamphetamine abuse, but has not used in over a month and was fired from his job in September 2009 (Exhibit 5F/17); on September 7, 2010, the claimant reported that his *lower back pain was worse after recently lifting weights* (Exhibit 5F/11); and on October 20, 2010, the claimant reported being in pain, but is awaiting authorization for surgery (Exhibit 5F/5).

Id. at 30 (emphasis in original).

On March 9, 2011, Dr. Jay M. Shuken, a podiatrist at AIHS, wrote a letter, addressed to no one in particular, regarding Plaintiff's treatment.  Id. at 330.  Dr. Shuken stated that, when Plaintiff was "first seen" at AIHS, "[h]is primary problem . . . was pain

---

[2] Plaintiff is 5 feet, 11 inches tall and weighs approximately 245 pounds.  AR at 65.

[3] The ALJ was only able to review records covering Plaintiff's treatment by Dr. Hope from July 2010 to September 2012.  See AR at 209-37, 345-48.  After the ALJ issued her decision, Plaintiff submitted new treatment records to the Appeals Council, covering his treatment by Dr. Hope from September 2012 to June 2013, which are now part of the administrative record.  See AR at 4, 370-408.  The Court considers all of the evidence in the administrative record when "determining whether the Commissioner's decision is supported by substantial evidence."  Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157, 1159-60 (9th Cir. 2012).

5

on the bottom of both feet," which "lasted approximately 3 years." Id.  According to Dr. Shuken's letter, Plaintiff "stated the pain under his left foot is 50% worse than his right foot," and denied "any self or professional treatment or any history of trauma." Id.  Dr. Shuken stated that, "[b]ased on examination," Plaintiff exhibited "a hard, painful mass under the arch of the left foot," and "a smaller growth on the bottom of the right foot." Id.  Dr. Shuken stated the growths were "benign tumor[s]" for which "surgical excision" was possible.  Id.  However, Dr. Shuken stated, "there is a high reoccurrence of this tumor" and the condition would "cause a painful disability on ambulation of pre and post surgery."  Id.

On March 11, 2011, Plaintiff was seen for a routine medication refill of Norco and Flexeril, which are pain medications.  Id. at 31.  On March 31, 2011, Plaintiff reported increased arthritic pain when the weather was cold.  Id.  On June 9, 2011, Plaintiff had right arm numbness due to an "overuse injury."  Id.  On July 7, 2011, Plaintiff stated his unemployment benefits would run out in a few months.  Id.  On September 14, 2011, Dr. Hope added three new problems to Plaintiff's list of "active problems": leg pain, lumbago, and depressive disorder not otherwise specified.  Id. at 346.

The ALJ accurately summarized later portions of Dr. Hope's treatment records as follows:

> [O]n December 27, 2011, the claimant still reported lower back pain, foot pain, knee pain and hand pain (Exhibit 15F/22); on March 22, 2012, the claimant reported that *Norco helps with his leg pain* (Exhibit 15F/16); on May 9, 2012, the claimant reported that he needed an early refill of his pain medication because he was going to visit family in Oregon (Exhibit 15F/13); and, on July 3, 2012, the claimant was given another Norco refill and the claimant noted that *the medication helps his chronic leg pain due to feet tumors* (Exhibit 5F/5).

Id. at 31.

According to the "subjective" section of Dr. Hope's treatment report from

6

September 4, 2012, Plaintiff suffered from "chronic [lower back pain] and leg pains"; had been "unable to walk easily and unable to work since about 3 years"; had developed tolerance to his pain medications and needed surgery on his feet as soon as possible; used a cane or crutches "on bad days"; suffered from "hand arthritis and elbow pains and shoulder pain" on his right side; was sometimes "unable to open jars due to pain" in his right arm; was depressed due to his disability; had chronic left knee pain; and needed "surgery and specialty care ASAP." Id. at 347. According to the "objective" portion of the treatment report, Plaintiff was well-nourished and well-developed. Id.

On November 6, 2012, Dr. Hope saw Plaintiff. Id. at 401. According to Dr. Hope's treatment report from that date, Plaintiff still suffered from chronic pain and "difficulty walking," but "pain meds help." Id.

On January 3, 2013, Dr. Hope saw Plaintiff. Id. at 398. According to Dr. Hope's treatment report from that date, Plaintiff's foot tumors were "slowly growing" and he needed surgery but did not have insurance to obtain surgery and was "unable to work at all due to full medical disability." Id.

On January 31, 2013, Dr. Hope added a new problem to the list of Plaintiff's "active problems": "pain in leg due to fibromas in feet." Id. at 384.

On June 26, 2013, Plaintiff saw Dr. Hope. Id. at 372. Plaintiff complained his pain was "worse" and stated he was "using crutches more over [the] last week." Id. Dr. Hope's treatment report from that date states Plaintiff was "unable to work and fully medically disabled," and was "tolerating meds and they don't help much with pain." Id. Dr. Hope stated he did not "want to incr[ease] dose if poss[ible]." Id. At the time, Plaintiff had been prescribed the pain reliever methocarbamol, to be taken "if needed," and the pain reliever ibuprofen, to be taken "as needed." Id.

On an undated sheet from a prescription pad, Dr. Hope wrote: "Mark has full medical disability due to severe lower back pain with radiculopathy and knee pain from arthritis." Id. at 178.

C.   **Other Evidence**

   **1.   Disability Reports**

In a disability report dated September 15, 2010, the interviewer noted Plaintiff "was casually dressed and was using a cane"; had difficulty rising from his chair and walked slowly and with difficulty"; "could no[t] sit for more than 10 minutes without standing"; "was up and down throughout the interview"; and "had obvious arthritic changes in both hands." Id. at 130.

In an undated disability report, Plaintiff stated he stopped working on August 27, 2009, because he was laid off. Id. at 133. Plaintiff stated he takes the following medicines, all prescribed by Dr. Hope: cortisone, for inflammation; a muscle relaxant, for muscle spasms; and Vicodin, for pain. Id. at 135.

   **2.   Exertion Questionnaire**

In an Exertion Questionnaire dated November 16, 2010, Plaintiff wrote he "can't grip items, can't bend knee, can't walk on feet without serious pain and compensating for feet and knee throws back out." Id. at 141. Plaintiff wrote that, if he is on his feet "too much," his "feet swell and get very painful" and his "knee gets weak." Id. Plaintiff wrote he can walk the "length of [a] football field" in "3 to 4 minutes," but he hurts and aches afterward. Id. Plaintiff wrote he cannot climb stairs; cannot lift or carry, due to doctor's orders; does not do his own grocery shopping; and can drive a manual transmission car for up to 20 miles at a time. Id. at 142. Plaintiff wrote that, before he became disabled, he was able to mow a large yard and trim hedges. Id. at 143. Plaintiff wrote he can only do housework for 20 to 30 minutes before "pain stops me." Id. Plaintiff wrote he is "currently only taking ibuprofen 800 mg 2x daily." Id. Plaintiff stated he needs "several rest periods throughout [the] day" of approximately one hour each. Id. Plaintiff stated he uses a knee brace every day, all day; uses a cane for light walking; and uses crutches if his feet are swollen and painful or if his knee is "unstable." Id. Plaintiff stated his knee is "arthritic [and] very painful," and his "lower back goes out

often now from overcompensating for my lower limbs." Id.

**D.     ALJ Hearing**

    **1.     Plaintiff's Testimony**

At the hearing before the ALJ, Plaintiff testified he lives with his wife, who works outside the home, and with his mother and two sons. Id. at 49. The ALJ asked Plaintiff why he stopped working, and Plaintiff answered: "Because I was in an automobile accident. I was rear-ended on October 30th, 2009." Id. at 50. The ALJ noted "the records indicate you got fired." Id. at 51. Plaintiff explained he had been laid off before the car accident for failing to follow "company procedure." Id. Plaintiff testified his injuries from the car accident "kept me from looking for work." Id. Plaintiff testified he received state disability benefits for approximately two years after the car accident. Id. at 52.

The ALJ asked Plaintiff what he considered to be his "worst problem." Id. Plaintiff answered "[m]y left knee" and the growths on his foot. Id. The ALJ asked Plaintiff why he had not had the growths excised. Id. at 53. Plaintiff answered he has no insurance. Id. Plaintiff stated, although his wife has health insurance through her job, it covers only herself and "my child." Id. Plaintiff testified he "tried everything" but could not afford to get the growths excised. Id.

The ALJ asked Plaintiff whether he received a cash settlement after the car accident. Id. Plaintiff answered he did. Id. at 54. The ALJ asked Plaintiff, "And where did that money go?" Id. Plaintiff answered: "That went to – I only ended up with like $7,000. . . . It was a very small amount." Id. (paragraph breaks omitted).

The ALJ asked Plaintiff what else would keep him from working. Id. Plaintiff answered: "My back. Lower back pain. And that was told to me I have arthritis running all through it. And I have arthritis on my right wrist." Id.

Plaintiff complained he also suffered from "a lot of depression right now." Id. at 56. The ALJ asked Plaintiff whether he had discussed his depression with any doctors at

AIHS. Id. Plaintiff answered he had discussed the problem with Dr. Hope, who "has me on an antidepressant." Id. The ALJ stated Dr. Hope's records did not "suggest that that's an issue . . . that he addresses with you." Id. The ALJ asked Plaintiff what Dr. Hope prescribed for his depression, and Plaintiff answered, "I don't even know what this is." Id. at 57. The ALJ asked Plaintiff if the medication was helping. Id. Plaintiff answered, "Yeah, it's – honestly, it didn't seem to be helping at all." Id. The ALJ noted Plaintiff was speaking in the past tense, and asked Plaintiff if he had "stopped taking" the antidepressant. Id. Plaintiff answered he had, "[p]robably two months ago." Id.

The ALJ asked Plaintiff whether he would be able to perform a sedentary job, in which he could sit down most of the day. Id. at 58. Plaintiff answered he "can't really even sit down" because his foot "starts spazzing." Id. Plaintiff stated his foot spasms seemed to be worse in cold or rainy weather, but he has "spasms pretty much all the time in my foot or in my back." Id. at 59.

The ALJ asked Plaintiff how he spends the day. Id. at 63. Plaintiff answered: "Sitting there, talking with my mom and . . . praying a lot. That's about it. Talking to the neighbors." Id. (paragraph breaks omitted). Plaintiff stated he is "in a lot of pain right now: daily pain." Id. The ALJ asked Plaintiff what he takes on a daily basis for pain. Id. Plaintiff answered, "A lot of prayer." Id. Plaintiff then explained he had not taken Norco in "a month and a half" because he does not want to become addicted to it. Id. at 64. Plaintiff stated Dr. Hope "keeps prescribing [Norco], and I think I'm going to take them, and I just put them off to the side because that's just another thing I don't want to have to deal with in my life right now." Id.

Plaintiff's attorney asked Plaintiff how much he drives. Id. Plaintiff answered, "Oh, just around town. Probably just to pick up my son from school and just to go to the store with the wife and just to get out a little bit." Id. Plaintiff stated his feet swell, especially his left foot, and that he copes with the swelling by elevating his left foot "past my heart" "about an hour, hour and a half" per day. Id. at 65-66. When asked what time of the day he typically needs to elevate his foot, Plaintiff answered: "It depends if –

when I've been on it. . . . It's usually right after. It also depends on what shoes I'm wearing because I haven't even figured out what shoes work and what shoes don't." Id. at 66.

### 2. Vocational Expert's Testimony

A vocational expert (VE) testified at the hearing, after listening to Plaintiff's testimony and reviewing his vocational background. Id. at 66. The ALJ asked the VE whether a hypothetical person could perform Plaintiff's past relevant work, if that person had Plaintiff's age, education, work experience, and residual functional capacity (as determined by the ALJ). Id. at 33. The VE testified that such a person would be able to perform Plaintiff's past relevant work as either a coffee shop manager or bouncer. Id.; see also id. at 66-69.

## III.
## STANDARD FOR EVALUATING DISABILITY

In order to qualify for DIB, a claimant must demonstrate a medically determinable physical or mental impairment that (1) prevents him from engaging in substantial gainful activity and (2) is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998). The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

To decide if a claimant is disabled, and therefore entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1) Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2) Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

| | | |
|---|---|---|
| (3) | Does the claimant's impairment meet or equal one of the specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments")? If so, the claimant is found disabled. If not, proceed to step four.[4] |
| (4) | Is the claimant capable of performing work he has done in the past? If so, the claimant is found not disabled. If not, proceed to step five. |
| (5) | Is the claimant able to do any other work? If not, the claimant is found disabled. If so, the claimant is found not disabled. |

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54. Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry. Id. at 954. If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

///
///
///

---

[4] "Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's [residual functional capacity]." Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1222-23 (9th Cir. 2009) (citing 20 C.F.R. § 416.920(e)). In determining a claimant's residual functional capacity, an ALJ must consider all relevant evidence in the record. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006). This involves, *inter alia*, evaluating the credibility of a claimant's testimony regarding his capabilities. Chaudhry v. Astrue, 688 F.3d 661, 670 (9th Cir. 2012).

# IV.
# **THE ALJ'S DECISION**

## A.    Step One

At step one, the ALJ found Plaintiff "has not engaged in substantial gainful activity since October 30, 2009, the alleged onset date." AR at 26 (citation omitted).

## B.    Step Two

At step two, the ALJ found Plaintiff "has the following severe impairments: fibromatosis feet; lumbar sprain; remote history of left knee arthroscopic repair; [and] obesity." Id. (citation omitted).

## C.    Step Three

At step three, the ALJ found Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." Id. at 27 (citations omitted).

## D.    RFC Determination

The ALJ found Plaintiff has the RFC "to perform light work . . . which is further limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling." Id. at 28.

## E.    Step Four

At step four, the ALJ found Plaintiff "is capable of performing past relevant work as either a coffeeshop manager or bouncer." Id. at 33.

## F.    Step Five

The ALJ did not analyze step five.

13

## V.
## DISPUTED ISSUES

Four issues are in dispute:

1. "Whether the ALJ erred in her assessment of medical opinion evidence from plaintiff's treating provider, Dr. Hope." ECF No. 26 at 3.
2. "Whether the ALJ's credibility assessment is supported by clear and convincing rationale in the absence of malingering." Id. at 12.
3. "Whether the ALJ's Step 4 determination and residual functional capacity assessment are supported by substantial evidence." Id. at 18.
4. "Whether the additional evidence submitted to the Appeals Council further erodes the ALJ's findings, establishing the decision is not supported by substantial evidence." Id. at 27.

The Court finds the first issue dispositive of this matter, and thus "decline[s] to reach [Plaintiff's] alternative ground[s] for remand." Hiler v. Astrue, 687 F.3d 1208, 1212 (9th Cir. 2012); see also Augustine ex rel. Ramirez v. Astrue, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[T]his Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand.").

## VI.
## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. This Court "may set aside a denial of benefits if it is not supported by substantial evidence or it is based on legal error." Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir. 2001) (citation and internal quotation marks omitted).

"Substantial evidence" is evidence a reasonable person might accept as adequate to support a conclusion. Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Id. To determine whether substantial

evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998); see also Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012) (stating a reviewing court "may not affirm simply by isolating a specific quantum of supporting evidence") (citations and internal quotation marks omitted).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  Reddick, 157 F.3d at 720-21; see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record.").    The Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely."  Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007).  If the ALJ erred, the error may only be considered harmless if it is "clear from the record" that the error was "inconsequential to the ultimate nondisability determination."  Robbins, 466 F.3d at 885 (citation and internal quotation marks omitted).

## VII.
## DISCUSSION

**A.    The ALJ Failed to Consider Listing 1.02.**

Plaintiff argues remand is "warranted for consideration of listing 1.02." ECF No. 26 at 11.

In a closing statement at the hearing before the ALJ, Plaintiff's counsel argued Plaintiff "may meet or equal Social Security listing 1.02."[5]  AR at 69.  At step three, the ALJ did not address whether Plaintiff met or equaled Listing 1.02.  See id. at 27-28.

---

[5] Listing 1.02 denotes "major dysfunction of a joint(s) (due to any cause)."  Social Security Administration, Bluebook, "1.00 Muscolosketal System - Adult," http://ssa.gov/disability/professionals/bluebook/1.00-Musculoskeletal-Adult.htm.

At step three, if the claimant has "present[ed] evidence in an effort to establish equivalence" to a listed impairment, the ALJ may not simply state that the Plaintiff "did not equal the listing." Kennedy v. Colvin, 738 F.3d 1172, 1178 (9th Cir. 2013) (citation and internal quotation marks omitted); Marcia v. Sullivan, 900 F.2d 172, 176 (9th Cir. 1990). Rather, the ALJ must "discuss the combined effects of [the] claimant's impairments" and compare them to a listed impairment. Kennedy, 738 F.3d at 1178 (citation and internal quotation marks omitted); see also Marcia, 900 F.2d at 176 ("[I]n determining whether a claimant equals a listing under step three of the Secretary's disability evaluation process, the ALJ must explain adequately his evaluation of alternative tests and the combined effects of the impairments.").

Here, Plaintiff explicitly argued he met or equaled Listing 1.02. The ALJ failed to analyze whether Plaintiff met or equaled that listing. Thus, remand is warranted for consideration of Listing 1.02.

**B.    Remand for Immediate Payment of Benefits Is Not Warranted.**

In the Joint Stipulation, Plaintiff repeatedly demands remand for an award of benefits, rather than for further consideration. ECF No. 26 at 5, 8, 31. Plaintiff contends the ALJ improperly discounted Plaintiff's credibility and Dr. Hope's opinion that Plaintiff is disabled. Id. Plaintiff further contends that, under the Ninth Circuit's "credit-as-true" rule, discussed *infra*, Plaintiff is thus entitled to an immediate award of benefits rather than further consideration by the Agency. Id.

**1.    Legal Standard**

This Court has discretion "to remand for further proceedings or to direct a payment of benefits." Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1098 (9th Cir. 2014) (citation omitted). Under the Ninth Circuit's "credit-as-true" rule, a court should generally remand a disability benefits case to the ALJ with instructions to award benefits if: "(1) the record has been fully developed and further administrative proceedings would

serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." Garrison v. Colvin, 759 F.3d 995, 1020 (9th Cir. 2014) (citations and footnote omitted).  However, even if those requirements are met, "we may remand on an open record for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." Burrell v. Colvin, 775 F.3d 1133, 1141 (9th Cir. 2014) (citation and internal quotation marks omitted).

**2.   Application**

The ALJ may address on remand Plaintiff's argument that she has improperly discounted Dr. Hope's opinion and Plaintiff's testimony.  See Augustine, 536 F. Supp. 2d at 1153 n.7.  However, even assuming the ALJ did improperly discount those pieces of evidence, by failing to provide legally sufficient reasons for rejecting them, remand for further proceedings, rather than for an award of benefits, is appropriate in this case, since the "record as a whole creates serious doubt as to whether [Plaintiff] is, in fact, disabled within the meaning of the Social Security Act." Burrell, 775 F.3d at 1141.  The following information, considered as a whole, creates serious doubt as to whether Plaintiff is actually disabled:

- On August 27, 2009, approximately two months before the alleged onset date of disability, Plaintiff was laid off from work for reasons completely unrelated to his alleged disability.  AR at 30, 50-52, 133.
- The alleged onset date, October 30, 2009, was the date of an apparently minor car accident from which Plaintiff drove himself home.  Id. at 192-93. At the ALJ hearing, Plaintiff initially claimed the car accident was the reason he stopped working.  Id. at 50.  Upon further questioning, however, Plaintiff admitted the accident was merely the reason he did not keep

17

1    looking for work.  Id. at 51-52.
2  - On March 12, 2010, five months after the car accident, Dr. Thomashefsky
3    found Plaintiff was "doing well."  Id. at 183.  Earlier that week, Plaintiff had
4    been released from physical therapy.  Id.
5  - On March 31, 2010, Dr. Thomashefsky released Plaintiff "to go back to
6    work."  Id. at 182.  Plaintiff's only back complaint on that date was
7    occasional, low-grade soreness in the lower back when he was active.  Id.
8  - At the time Plaintiff applied for DIB, on September 15, 2010, none of his
9    alleged bases for disability – *i.e.*, "left knee injury; lower back injury; [and]
10   arthritis in hands, knees" – had been diagnosed as "active problems" by Dr.
11   Hope.  Compare id. at 133 with id. at 346.  On the contrary, according to Dr.
12   Hope's treatment records, Plaintiff's only "active problems" at that time
13   were high cholesterol, hyperglycemia, and obesity.  Id. at 346.  Dr. Hope did
14   not add leg pain or lumbago to Plaintiff's list of active problems until
15   September 14, 2011.  Id.
16 - On September 17, 2012, at the hearing before the ALJ, Plaintiff claimed Dr.
17   Hope "has me on an antidepressant."  Id. at 56.  However, Dr. Hope's
18   treatment records do not state that he prescribed Plaintiff an antidepressant.
19   Id.  Moreover, Plaintiff was unable to name the antidepressant, then claimed
20   he had stopped taking it two months before because it had not been helpful.
21   Id. at 57.
22 - At the hearing before the ALJ, Plaintiff complained he was "in a lot of pain"
23   on a daily basis, but claimed he dealt with it simply through "[a] lot of
24   prayer."  Id. at 63-64.  Plaintiff stated he nevertheless continued to accept
25   prescribed Norco but "just put them off to the side."  Id. at 64.
26 - At the hearing before the ALJ, Plaintiff claimed at one point that he "can't
27   really even sit down," but then stated he spends most days "[s]itting" and
28   talking with his mom and neighbors.  Compare id. at 58 with id. at 63.

18

Thus, because the record as a whole creates serious doubt as to whether Plaintiff is, in fact, disabled, remand for further proceedings, rather than for an immediate award of benefits, is appropriate. See Burrell, 775 F.3d at 1141.

## VIII.
## **CONCLUSION**

IT IS THEREFORE ORDERED that judgment be entered REVERSING the decision of the Commissioner and REMANDING this case for further proceedings consistent with this Order.

DATED: May 7, 2015

HON. KENLY KIYA KATO
United States Magistrate Judge